# DECLARATION

I, Charles B. Parker, pursuant to Title 28, United States Code, Section 1746, under penalty of perjury and pursuant to the laws of the United States, state that the following is true and correct to the best of my knowledge, information, and belief:

1. I am an investigative or law enforcement officer of the United States within the meaning of Section 2510(7) of Title 18, United States Code, that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18. I have been employed as a Special Agent with the Department of Homeland Security, U.S. Immigration and Customs Enforcement, Homeland Security Investigations (HSI) since 2019. I am currently assigned to the Office of the Resident Agent in Charge, Greensboro, North Carolina.

2. Between 2015 until 2019, I was a Special Agent with the United States Secret Service (USSS), where I investigated financial crimes and computer-based attacks on the nation's financial, banking, and telecommunicating infrastructures. Prior to the USSS, I was a police officer for the Greensboro Police Department for 10 years. During that time, I prepared over 50 search warrants and participated in over 500 investigations. These investigations resulted in arrests, seizures, interviews, and prosecutions in local, state, and federal courts. I completed training at the Federal Law Enforcement Training Center in Brunswick, Georgia, where I received instruction in federal criminal statutes, search, seizure and arrest authority, and many other facets of federal law enforcement.

3. This Declaration is made in support of a Verified Complaint of Forfeiture of $71,370.00 in U.S. currency that was seized from Delroy Alphonso FLEMING on January


EXHIBIT A

30, 2024, at the Piedmont Triad International Airport (PTIA-GSO) in Greensboro, North Carolina.

4. The facts and information contained in this Declaration are based on both my own knowledge and experience, and law enforcement officers who participated in the investigation described below. This Declaration does not set forth all facts known to me or other law enforcement officers concerning the investigation.

5. Based on the facts set forth below, there is probable cause to believe the $71,370.00 in U.S. currency is subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) and 21 U.S.C. § 881(a)(6).

**FLEMING Arrives PTIA-GSO**

6. On January 30, 2024, the HSI Greensboro Airport Interdiction Team was conducting an operation at PTIA-GSO. At about 2:30 p.m., HSI Special Agent and Task Force Officers (TFOs) received information that a vehicle known to investigators was entering PTIA-GSO property.

7. Investigators were familiar with the vehicle and had previously identified the registered owner as a subject of interest in an ongoing drug distribution investigation. The vehicle owner has a criminal history dating back to 1996 that includes drug distribution, assault, and firearms offenses.

8. Investigators observed the white Dodge Charger dropped off a passenger, later identified as FLEMING, and then exit PTIA-GSO property.

2

9. Investigators identified FLEMING as traveling alone on Delta Air Lines flight #2330 to Pittsburgh, Pennsylvania. FLEMING was only carrying a black backpack and did not check luggage. FLEMING sat in a crowded area near departing gate #29.

**Public Safety Gate Check/Canine Sniff**

10. Investigators conducted a public safety gate check of gate #29 utilizing TFO S. Jones and his certified police K-9, Kookie.

11. TFO Jones has been a sworn law enforcement officer with the Piedmont Triad International Airport Police Department (PTIA PD) for the past 11 years and holds the rank of detective. In addition to basic law enforcement training in 2012, TFO Jones attended Police Law Institute, and took the following courses: Airport Narcotics Investigations, Highway/Rural Drug Investigations, and Basic K-9/Detector Dog Training.

12. TFO Jones has been certified through the U.S. Drug Enforcement Administration's Operation JETWAY Training program to conduct Interdiction Investigations and has completed over 1,000 hours of training throughout his career, with the majority of the training focusing on illegal narcotics. TFO Jones has conducted and assisted in narcotics investigations leading to the arrest and conviction of numerous narcotics traffickers in North Carolina.

13. TFO Jones has been assigned as a Detective/K9 in the PTIA PD Criminal Investigative Division (CID) since 2022. TFO Jones is a member of the North American Police Work Dog Association.

14. In August 2022, TFO Jones was selected to be a Narcotics Detection Dog Handler and assigned K-9 "Kookie," a German Shepherd, a breed specifically selected for their keen senses and ability to be trained to detect the odor of controlled substances.

15. K-9 Kookie was purchased by the PTIA PD from High Point Canine Solutions, High Point, North Carolina. After undergoing several tests as to her suitability as a police work dog, K-9 Kookie was accepted by PTIA PD and began training with TFO Jones in August 2022. K-9 Kookie and TFO Jones have completed over 300 hours of training and hold a current certification through the National Narcotic Detector Dog Association.

16. In training, K-9 Kookie was "imprinted" to detect the odor of cocaine, marijuana, methamphetamine, and heroin. At the beginning of training, the officers placed each of the four substances in a hidden box or luggage bag, and K-9 Kookie was rewarded with a toy when she correctly alerted. Then, the officers removed one substance at a time, and repeated the testing, until K-9 Kookie could detect the presence of any of the substances individually. K-9 Kookie has demonstrated that she can reliably use her olfactory senses to locate the odor of controlled substances, including cocaine, marijuana, methamphetamine, and heroin. After successful completion of this training, K-9 Kookie entered into service with the PTIA PD CID as a narcotics detection K-9.

17. On August 30, 2022, K-9 Kookie underwent testing with the National Narcotic Detector Dog Association in Greensboro, North Carolina. The testing consisted of a four-room exercise where narcotic substances were hidden in four different locations within the fire department public safety building. K-9 Kookie successfully alerted to the

four rooms containing controlled substances. This testing is a 100% pass or fail, where K-9 Kookie cannot false alert or fail to alert. Based on her 100% success rate of testing, K-9 Kookie received certification from the National Narcotic Detector Dog Association.

18. K-9 Kookie is trained to passively alert after detecting the odor of narcotics for which she has been trained. A passive alert consists of a physical reaction which ultimately ends in her coming to a sitting position and/or significant behavior change by a head snap, paw, or more intense sniffing at the point of narcotics for which she is trained to detect. K-9 Kookie also exhibits various mental and physical reactions that are noticeable to TFO Jones, which include changes in her behavior, such as becoming possessive of the area, a refusal to leave an area where the odor of narcotics is detected, and changes to her breathing rate and sniffing patterns.

19. TFO Jones has successfully demonstrated the ability to properly deploy and maintain a police narcotics canine and, with the assistance of K-9 Kookie, effectively locate controlled substances concealed in locations including but not limited to sealed packages, automobiles, luggage, electrical components/appliances, and in the ground. TFO Jones and K-9 Kookie have located and seized no less than 45 pounds of methamphetamine, 2,000 pounds of marijuana, 2.2 pounds of cocaine, 10 pounds of fentanyl, and $195,000.00 in U.S. currency.

20. TFOs A. Romero and V. Ayala systematically approached each of the seated passengers in the crowded gate area and informed them that law enforcement would be performing a public safety check of the gate area with a police canine. TFOs Romero and Ayala explained to the passengers that the police canine would be completing open-air

sniffs and asked for the passengers to place their carry-on belongings in front of them on the floor. Investigators specifically asked FLEMING the same and FLEMING placed his black backpack in front of him on the floor.

21. TFO Jones worked K-9 Kookie through the crowded seated area of Delta passengers and noted that K-9 Kookie was not producing a change in behavior while performing open-air sniffs of the other passengers' bags placed on the floor.

22. TFO Jones then worked K-9 Kookie past FLEMING and observed K-9 Kookie pull towards FLEMING's backpack, have a strong change in behavior, and actively paw at FLEMING's backpack. From experience, TFO Jones knew that K-9 Kookie had actively and positively alerted to the presence of illegal drug odor on FLEMING's backpack.

**FLEMING Search and Interview**

23. Investigators informed FLEMING that the canine alerted on his backpack and asked what was inside. FLEMING replied, "money."

24. Investigators asked FLEMING if he used marijuana and FLEMING stated he did not. FLEMING added that the money probably has the scent [of marijuana] on it.

25. FLEMING consented to a search of his backpack which contained bulk U.S. currency throughout and even in the exterior zipped compartments. There were multiple loose rubber bands along with the U.S. currency.

26. While the bulk cash comprised most of the backpack contents, other items included a couple of packs of CBD/THC gummy packs, gift cards, a t-shirt, two pairs

6

underwear, and a blanket still in plastic packaging. No other clothing or toiletry items were located.

27. Investigators asked FLEMING if he wished to relocate to a non-crowded gate area for privacy concerns due to the large sum of bulk currency. FLEMING stated he did not want to move and was fine with staying.

28. FLEMING was a ticketed passenger on Delta traveling to final stop Pittsburgh, Pennsylvania. FLEMING stated he was skipping the last leg of the flight and travelling to Atlanta, Georgia, and then to Las Vegas, Nevada, "for about a week" and that is why he had so much cash. FLEMING stated he lives in Atlanta, Georgia, and he was visiting family in Greensboro, North Carolina, for one day. FLEMING stated that he booked his flight yesterday – one day prior and one way.

29. Investigators asked FLEMING why he had such little clothing and he stated that this was all the clothing he was taking with him to Las Vegas; however, he soon stated he would get more clothes once he got to Atlanta.

30. FLEMING stated the total amount of U.S. currency was about $60,000. He stated he travels to Las Vegas two to three times a month for gambling. Investigators asked if FLEMING possessed a "Players Card"; however, FLEMING seemed unfamiliar with the term and later stated that he used his friend's card. FLEMING stated that he and his friends could go to Las Vegas and put $70,000 down on a table. Investigators tried to explain to FLEMING that casinos, operating as financial institutions adhering to Bank Secrecy Act and Know Your Customer guidelines, have specific currency reporting

requirements and one could not simply enter a casino and place large U.S. currency bets directly on a table.

31. Investigators asked FLEMING to explain his means of income. FLEMING stated that he has owned and operated a motor carrier trucking company for the past five years called "Lifeline Trucking." A database search returned a Lifeline Express LLC, 3645 Market Place Blvd, STE 817, East Point, Georgia, 30344, as a "NOT AUTHORIZED" operating status with a last reported mileage of 13,000 miles in 2021.

32. FLEMING later stated that he also owns a restaurant in St. Thomas, U.S. Virgin Islands, named Indigo 4. An open-source search shows that that chef-owner David Benjamin owns and operates a restaurant by the name of Indigo 4 in St. Thomas since its opening in 2021.

33. Investigators asked FLEMING if he had any ATM withdrawal receipts or banking statements, or if he would be willing to show online banking activity outlining any means of income. FLEMING stated that he did not have to show that. FLEMING stated that he did not withdraw this specific bulk currency from any bank. FLEMING added that he earns income through the trucking business by deposits "through contracts." He added that his company has one truck and one driver. Database records do not show FLEMING as having a Commercial Driver License.

34. Investigators further asked FLEMING if he filed taxes. FLEMING stated he files taxes but did not want to show any documentation at this time. FLEMING then got onto his mobile phone with someone and asked that person to send tax documents.

FLEMING produced a screenshot photo in his gallery of what appeared to be an iPhone "Note" entry:

> *Lifeline Express LLC*
> *EIN 85-2087279*
> *Address 3645 Marketplace Blvd, Ste 130 unit 817, East Point GA 30344*
> *Deposits for 2022 - $230,120.43; Withdrawals (which included payroll and gas) 200,414.80(sic)*
> *If you have any questions you can call me at (340) 201-1127. I'll be the point of contact*
> *Thank you*

35. Investigative research shows that the address appearing in the aforementioned note is an UPS Store and unit 817 is a Post Office box.

**U.S. Currency Seizure and Second Canine Sniff**

36. Based on the totality of the facts, I authorized and directed the seizure of the U.S. currency.

37. Investigators informed FLEMING that law enforcement was seizing the bulk U.S. currency in his backpack. Investigators explained that FLEMING would receive a certified letter in the mail detailing the seizure process and his means for contesting the seizure. Investigators placed and sealed the bulk U.S. currency in U.S. Immigration and Customs Enforcement evidence bag #L1139309.

38. Shortly after the seizure, TFO Jones prepared for a blind open-air line-up in a hallway of the PTIA PD. TFO Jones placed the seized bulk U.S. currency in a cardboard box along with two empty cardboard boxes placed evenly apart. TFO Jones deployed canine K-9 Kookie. Kookie positively alerted for the presence of illegal drug odor on the box containing the seized bulk U.S. currency.

39. TFO Jones and I then transported the U.S. currency to State Employees Credit Union where it was counted and converted to a cashier check payable to U.S. Customs and Border Protection in the amount of $71,370.00. The cashier's check was subsequently deposited into the U.S. Immigration and Customs Enforcement Suspense Account.

**FLEMING Returns to PTIA PD**

40. FLEMING elected to miss the Delta flight and rebooked on a later flight. During his flight downtime, FLEMING approached PTIA PD Sgt. B. Geiger to further speak about the money seizure. FLEMING asked Sgt. Geiger scenarios that involved not being able to account for the money through documented sources. FLEMING asked what if his parents gave him the money or if he had just been saving it. Sgt. Geiger ended the encounter by informing him to expect the letter detailing the process.

**FLEMING's Criminal History**

41. On March 7, 2003, FLEMING was convicted following a jury trial, in Bronx County Superior Court in New York, for criminal possession of a controlled substance in the first degree, a class A-1 felony, and subsequently sentenced to 15 years to life.

**FLEMING's Recent Flight History**

42. FLEMING had extensive air travel throughout 2023 with American Airlines and Delta. FLEMING predominately booked one-way tickets with short booking notice, and often utilized "skip-leg" flights. Skip-leg (or skiplag) is a travel strategy where passengers intentionally book a multi-leg flight but plan to disembark at a connector or layover instead of completing the entire flight to the final destination.

43. FLEMING routinely travel to and from St. Thomas, U.S. Virgin Islands, which is a known destination source of illegal drugs; namely cocaine. The U.S. Virgin Islands are commonly used as cocaine transshipment locations; most of the cocaine smuggled to the islands from South America is transshipped to other markets, primarily on the U.S. mainland.

**Additional Facts Showing Probable Cause**

44. During the interview, FLEMING made certain claims to show his proof of income. FLEMING stated he owned Indigo 4 restaurant in St. Thomas. Investigators noted this was demonstrably false.

45. FLEMING stated he routinely travels to Las Vegas to gamble large amounts of money. Per his statement, FLEMING claimed to travel to Las Vegas "two to three" times a month. Flight records show that he flew to Las Vegas one time in 2023.

46. Investigative research also does not show Bank Secrecy Act information, such as casino Currency Transaction Reports, commensurate with FLEMING's gambling claims.

47. FLEMING further stated that he owned and operated the trucking company, Lifeline Express LLC. A U.S. Department of Transportation Safety and Fitness Electronic Records (SAFER) search of USDOT Number: 3458147 returns a company snapshot detailing the records. The report states there is one (1) driver and last recorded mileage was 13,000 in 2021. This does not appear to be commensurate with purported claims of income. Additionally, the physical address listed for the company, 3645 Market Place Blvd, Ste 817, East Point, Georgia, 30344, is a UPS Store.

48. FLEMING was also unaware of the total amount of U.S. currency he was carrying. FLEMING stated it was $60,000 when in fact it was $71,370 in U.S. currency.

49. The bank count found the bulk U.S. currency included two thousand four hundred thirty (2,430) $20 bills, one hundred sixty-eight (168) $100 bills, one hundred twelve (112) $50 bills, thirty-six (36) $10 bills, and two (2) $5 bills. Furthermore, there were loose rubber bands located inside the backpack with the bulk U.S. currency.

50. Proceeds of illegal drug sales are often kept and transported as bulk currency banded by a specific denomination such as $20, $50, and $100. Drug traffickers often carry bulk currency in this fashion to avoid financial banking requirements, for anonymity, and to facilitate quick drug transactions. In addition, bulk currency banded in $20, $50, and $100 denominations is indicative of street-level drug sale proceeds.

**FLEMING's Administrative Claim**

51. U.S. Customs and Border Protection (CBP) initiated an administrative forfeiture proceeding with respect to the $71,370.00 in U.S. currency.

52. On March 4, 2024, CBP received a claim from FLEMING stating that the money belonged to him. Upon receipt of the claim, CBP terminated the administrative forfeiture process and referred the seizure of the $71,370.00 in U.S. currency to the U.S. Attorney's Office for judicial forfeiture.

## CONCLUSION

53. Based on the foregoing, there is probable cause to believe the $71,370.00 in U.S. currency was furnished or intended to be furnished in exchange for a controlled substance, in violation of the Controlled Substances Act, 21 U.S.C. §§ 801, *et seq.*, or represents proceeds traceable to such an exchange, or was used or intended to be used to facilitate violation of the Controlled Substances Act, and is therefore subject to seizure and forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C) and 21 U.S.C. § 881(a)(6).

This the 31st day of May, 2024.

*C B Parker*
Charles B. Parker
Special Agent
U.S. Immigration and Customs Enforcement
Homeland Security Investigations